And the court will proceed to the third case of the day, the United States v. Harris. Okay. Mr. Kelleher. Good morning, your honors. Under the court's de novo review, reversal is necessary because the warrantless search of Willie Harris' truck cannot be saved by the automobile exception or as a search incident to arrest. The facts are a bit tricky, and the briefs may have sown further confusion, largely because there is a disconnect as to who was the object of the search. Are we dealing with the defendant, Mr. Harris, or the unindicted co-conspirator, Ms. Watkins? The prosecution analyzed the search through Ms. Watkins, but she wouldn't have standing to challenge the search. She was arrested in the bank, not the truck, and the truck searched was Mr. Harris'. The fruits of the search, the notebook, was Harris'. The conviction at issue is Harris'. And finally, the illegal arrest of Harris' took him out of the picture as Officer Janaga went into his truck. Now, even if the court disagrees and determines that Watkins is the focus, the Fourth Amendment was still violated. I would like to first apply the automobile exception and search incident to arrest to Harris and then to Watkins. The auto exception is inapplicable to Harris because there was no individualized suspicion tying him to the conduct in the bank. Mr. Harris could not have been arrested for sitting in a handicapped parking spot because such conduct is not criminal. Even then, there could not have been probable cause to search his vehicle for evidence of a parking infraction. The search incident to arrest is also inapplicable to Mr. Harris. This exception, of course, presupposes that the arrest is legal. Mr. Harris' was not, removing this case from the purview of Gantt v. Arizona. Put simply, Harris should have been in the truck. If he's in the truck, officers can ask him for Watkins' belongings or if he consents to a search. The prosecution should not be able to capitalize on an illegal arrest. Now, as to Watkins, the search incident to arrest does not apply to her because she was arrested in the bank, not the truck. She was already in custody in the bank. She was not an occupant of the vehicle, nor was she a recent occupant of the vehicle. Indeed, the prosecution does not argue that she's an occupant or a recent occupant. They only obliquely state that she, quote, recently occupied the vehicle. And this is true because the police knew nothing and no clue as to what her connection was to Harris or to the truck when she was arrested in the bank. So there is simply no authority supporting a search incident to arrest as to Watkins, since a person never seen in a car cannot be a recent occupant. Which car was her stuff in? Her stuff was in the truck, Mr. Harris' truck. Did she tell him that? She did tell Officer Janaga that her stuff was in the truck. And wanted him to get it. I'm sorry? And wanted him to get it. Yes, she requested that. But officers never saw her in the truck. They never saw her getting in the truck. They never saw her getting out. And that is why the auto exception would not apply to Watkins as well. You have no quarrel with going to get her material and delivering it to her? Well, I would say we do, Your Honor, in the sense that she, I mean, the officer was doing her a favor in essence. Nothing illegal about doing a favor, is there? Well, no, Your Honor. But a reasonable officer, I think, would first ascertain whether he has the ability to go into a truck. She says her goods are in the truck. He has to ascertain whether that's factual before he can go get the stuff? I think he does, Your Honor. At least we know what you're talking about. I think that he did have a duty, especially since he knew, the officers knew, that Mr. Harris was the driver. And he simply, it's a cop-out to say that, well, I didn't know who the owner was, which is what he says. I did know who the owner was, so it's not a cop-out. But the real question is, the one I've just pinpointed, whether the officer had a right, under the circumstances in this case, to go to the truck where the girl herself said her goods were, and return it to her. And I would answer no, Your Honor. You did. And on that point, if there's incriminating evidence, would Watkins, why would she ask the police to get it? In other words, would a reasonable officer think that an arrestee Would a reasonable defendant be in a position like that anyway? Well, I just It seems reasonable, less than a part of people being investigated, as well as the officer. Well, I think in most I don't think most people act reasonably, but that's a personal opinion. I think in most instances, a reasonable officer would not necessarily think an arrestee would want an officer to find incriminating evidence. Probably true. And would not want to draw attention to incriminating evidence. I think there's also no probable cause to believe the truck had evidence, because a search for evidence was never done. There were at least seven officers at the scene, and that included two detectives. And no one thought to look into the truck for evidence of this credit card fraud. There was also no probable cause to believe the truck had evidence, because it was never inventoried or impounded. They simply left it sitting there at the bank. Additionally, Officer Janega didn't even look at the notebook until the following day. Now, all these points demonstrate that this was considered by officers to be a mundane offense, not a conspiracy spanning 21 states. And this was entirely reasonable, considering the totality of the circumstances. You essentially have two kids, two high school kids. It's the middle of the day. The record does not reflect it's a high crime area. You're two, three blocks from the police station. And there's no prior knowledge by the police of these arrestees. Well, maybe that's why nothing happened for a full year. Well, Your Honor, I'm not sure why it took them so long. Me either. Yeah. Well, maybe because they didn't think much of what you're worried about, what they got. There doesn't seem to be anything, whatever this notebook says or whatever, but whatever it was, that wasn't really inspired. Maybe it was, but it didn't seem to be inspiring, this whole investigation. It's finally caught up with these kids. I say kids, man, pretty sophisticated for 18-year-olds. Well, somewhat sophisticated, but it was ultimately a... To me it is. Maybe nowadays that isn't sophisticated. Well, a handwritten notebook, I should say, the items, the identifying information was handwritten. I'm surprised he actually wrote something down. I think additionally, to answer your point, the notebook itself, Officer Jannigan the next day began calling some of the numbers and determining who these people were, who these victims were. And a month after the fact, he gave the notebook to the postal inspector, Postal Inspector Frank. So this notebook wasn't simply collecting dust on Officer Jannigan's desk. They knew that there was something here. And ultimately, as to why it took so long for state law enforcement, for the postal inspectors to actually do anything, I mean, that's, I think, a testament to the inertia of the government. But I think what's important for the court to consider is what this case is not and what facts are not here. And this is a different case if the defendant is in the bank or if he's seen by officers pacing suspiciously in front of the bank. If Watkins is in the car or if she's seen by officers getting in or getting out of the car. None of these facts existed. And I think what makes this case sui generis is that Watkins' arrest was not a culmination of an investigation or a driving infraction witnessed by an officer. And that's what the bulk of these Fourth Amendment cases that this court has dealt with involves. So this case is very unique in that regard, and I would ask the court to consider that point. As to whether the notebook itself was harmless, the prosecution claims it is. But the notebook was a written, signed confession, essentially. It contained 14 names, had nine pages full of identifying information. And while the evidence was strong against Mr. Harris, it was not overwhelming. Defense counsel could and did attack the testimony of the co-conspirators, and he made significant inroads undermining their credibility. But he was stymied by this notebook. The only thing he could say was simply, well, the police didn't use gloves when they were handling this notebook. And as the court knows, there was 48 fingerprints lifted from this notebook. Excuse me, 50, 48 being Harris'. So essentially all he could say was, well, the police didn't have gloves. That was it. And frankly, there was nothing else he could say about this notebook. Now, the prosecution paints the notebook as inconsequential, but its actions in the district court say otherwise. If this was simply a matter of gilding the lily, why do it? Why risk, why jeopardize a conviction on appeal? They knew, according to the district court, that this was a close call. Why not abandon this notebook before trial and save all the trouble? Additionally, a fingerprint expert was hauled in just for this notebook. To further put things in perspective, volumes 5 through 9, which are the trial transcripts, consisted of approximately 1,100 pages. And if you look at the testimony addressing this notebook, it consumed at least 100 pages, if not more. So it's approximately 10% of the trial concerned this notebook, in addition to the 42 pages of the suppression hearing transcripts. So it was a big deal. Ultimately, we would ask this court to hold that if a search incident to arrest isn't proper to a driver, officers cannot search and seize the driver's property incident to another person's arrest when that person wasn't in the car or was not seen entering or exiting the car. If there are no further questions, I would reserve the balance of my time. Thank you. May it please the court, Mr. Kelleher, my name is John Nachesik. I'm here representing the United States in this matter, and I'm here to ask the court to affirm the judgment of the district court. And I want to start off with the issue that Mr. Kelleher, my friend, Mr. Kelleher, raised with regard to the importance of this document. And I believe the district court got this right, but Mr. Kelleher refers to this document as the hub of the investigation. And the facts simply don't bear that out. He doesn't really talk about, he doesn't point to anything in particular, and I do dispute the number of pages that were involved in the transcript relating to this notebook, but the notebook related to one substantive count, one overt act of the conspiracy count of the indictment. It didn't relate to any of the substantive counts. He also neglects to mention that there were two other examples of similar handwritten information of another notebook, actually, that was found in the Atlanta search that contained information of four other individuals. Very detailed information, just like was contained in this notebook. And so this was not the only notebook that was in evidence in the case. There was also testimony by individuals that they had seen Mr. Harris writing in notebooks, and the time frame of their involvement would indicate that this was another notebook, possibly. So this was apparently part of his MO, is to maintain this information in notebooks. Now, that notebook in particular was seized on April 7th, 2008. The conspiracy continued to July 10th or August of 2010, and of course the other notebook was recovered in the search in August of 2010. The notebook did not lead to a single new victim other than Mr. Saltzman, whose information Ms. Watkins had inside the bank with her, that was apparently from this notebook that was recovered from the car. So of the 14 people that were in that notebook, only one victim, the one that Ms. Watkins had the information on, ended up being a victim. So it didn't lead to any other victims in this case. It didn't lead to any other defendants in the case. None of the other people that were indicted along with Mr. Harris were named in this notebook. It simply really led nowhere except to itself, that it was an example of the type of information that he had. And by the way, that information is, I think, part of the sophistication of this scheme, because the information that was contained in these notebooks was incredibly detailed, and we still do not know where the defendant obtained such detailed information. Dates of birth, social security numbers, credit card numbers, addresses, phone numbers, even passwords. So we never learned that, and that is fairly unusual to see that sort of detailed information. The notebook... I mean, even though the investigation, because obviously the social security numbers are pretty key, there's no indication how they got all this? No, we never learned how that happened, and that's disturbing. We don't know. And that degree of information was in itself sophisticated. Well, that's what I... You know, these people are pretty young. I don't know where they learned all this. I doubt it was in math class. Well, Mr. Harris was pretty young, but he was also not new at this. His state court conviction that pre... I think he was charged in January of 2007 consisted of 35 counts of identity theft and related types of offenses that used the same modus operandi as this case. Wasn't he 17 or 18 then? Yes. It was a juvenile case, but it was waived to adult court because of the... I suppose because of the seriousness of it. I'm not sure about that. So not a single additional victim was identified as a result of that notebook, and I also want to point out it's not part of the record, but it is public record. The search warrant that was conducted in August of 2010, which detailed the investigation, doesn't mention that notebook at all. It mentions the fact that the defendant was arrested on April 7, 2008, in Munster as a result of this event there, but it doesn't mention anything about the notebook. So it didn't even lead to the search in August of 2010. Now with regard to... I think it was a search down there. Pardon me? Wasn't it a local police officer that was sort of leading the search down in Atlanta? No, I believe it was Cecil Frank and Harris, Inspector Harris from the Postal Inspection Service. So that was a postal effort, so that's everywhere, I guess. And they obtained a federal search warrant from the Northern District of Georgia for that case, for that search. Now as far as the district court's decision with regard to the suppression of the notebook, the defendant says that the police knew nothing about Ms. Watkins. They did know, and as you pointed out, Judge Manu, they did know that she had come from that car because she asked Inspector Jannega, or Detective Jannega, to retrieve her items. And that request also, just as an aside, as the district court said, this is not the type of case where there is a knowing abuse of the process that the exclusionary rule is designed to discourage. This was clearly a good faith. The officer was trying to do her a favor by retrieving her school stuff, her book bag and her coat. He didn't find the coat. He even took the defendant's wallet out of the car and returned it to him at the police station for safekeeping. So this officer was clearly not trying to abuse the process. He was just retrieving items. And you look at what, and as far as the fact that nobody thought to search the car, search the truck, you look at, as the district court did, what the officers knew from an objective standard, not from the subjective standard. So that's why the district court was able to look at what Mr. Officer Jannega knew had happened. Now, unfortunately, we don't have a lot of information about what happened inside that bank, which was troubling to me. But the Assistant U.S. Attorney said that the officers that were involved in that weren't available for this hearing, so they weren't there to testify. But we do know that she is arrested in the bank by Jannega, and she's got two false cards, one for Mr. Sulzman, and she's also got a slip of paper with Mr. Sulzman's personal information. The other card, she doesn't have that. Now, the district court said that under these circumstances, it would be appropriate to see if there was additional information contained in the car, that there would be probable cause that she wouldn't bring everything that's related to her identity theft effort into the bank. And that's just like this court's decision in Zahersky, where the defendant argued, well, if they didn't find something on the defendant inside the Starbucks coffee shop, then there would be no reason to look in his car. And this court said, no, there would be reason to look in the car because there would be evidence of the person traveling to this location to meet this young woman. And without getting too much into the facts of that case, I'm not sure if my light's on or not. All right. I'll holler if the light goes on. Okay. So the district court found that there was probable cause to believe that there would be additional information related to her identity, if just evidence of her true identity or evidence relating to this other false card that she had with her in the vehicle. And just like this court's decision in Edwards, where this court held that there was information relating to, there would be information relating to the offense in the car under a probable cause standard. Let's say, take for example, if she had walked into the bank, put a gun down on the counter and said, give me $3,500. If it was an armed robbery, wouldn't the police certainly have probable cause to go out and look in the car? No, no. Depends. Which she arrived in at the bank. And that would also justify the detention of the person that's driving that car. You know, there's no constitutional requirement for you to continue to talk if you're finished. Well, Mr. Jasek. Well, I can take a hint, Judge Fowler. Mr. Jasek, let me ask you a question. I'm a little unclear why there wasn't a little more focus at the trial level on the arrest of Mr. Harris. The motion, although neither side seemed to spend a whole lot of time, although the motion to suppress was based on the inappropriateness of the arrest, and Judge Simon says he's unclear. At least that's the word I get. Yes, he does say he's unclear as to whether or not there was, we're not conceding that there was a probable cause to arrest the person based on the cases we've cited in our brief, Pringle and Wyoming versus Houston, the fact that passengers and drivers are presumed to be engaged in common enterprise with the driver. But I believe, Your Honor, that there was not much focus on that because there was no need to focus on it. At least the judge found no need to focus on it. Personally, I would have liked to have more information about that. Without a motion to suppress, you would think the underlying foundation would be the arrest. Well, but there was nothing that flowed from that arrest. I mean, there's a Smith case that we've cited in our brief where this court ruled that if there's nothing that comes from an illegal arrest, then there's no need to, I mean, you can sue the police department. But in this case, the seizure flowed from the arrest of Ms. Watkins, who had arrived at the bank in that car, and that gave the officers, on an objective standard, the ability to either search the car under the automobile exception or under the search incident to arrest of a recent occupant. Thank you. Thank you, Mr. Maciasek. Mr. Kelleher. Thank you, Your Honors. Mr. Maciasek talked about this other notebook. The other notebook had four names versus the 14 in the notebook that was found in Mr. Harris' truck. Secondly, that other notebook was never fingerprinted. Thirdly, that other notebook was found in a car registered to Melvin Adams, so it's not entirely clear as to who actually owned that other notebook. And again, this notebook that was found on Mr. Harris was obviously fingerprinted. It had a number of additional names and was, again, found with him. So I think it's completely distinguishable in that regard. As far as the abuse of process, it's true that the officer was essentially doing her a favor, but we have to ask why there was no one in that car. Why wasn't Mr. Harris in his car? And he wasn't in his car because he was arrested. And we don't know why he was arrested other than just simply sitting in a handicapped parking spot. And we made clear in the briefs, we cited a number of cases, Yabara, Bonham, otherwise, that says that there must be suspicion particularized to that individual. So the reason that he was doing Ms. Watkins a favor was because the driver was sitting in the back of a squad car for an illegal arrest. So I think the court has to, again, consider the totality of circumstances and consider why this truck was unoccupied, and it's because of an illegal arrest. And as far as the case law that counsel cites today, again, in the reply brief, I think we distinguish pretty adequately Zahersky and Edwards. Those cases are completely different on the facts. Edwards involved a stolen car. Once again, as I said in the opening remarks, that there was no reason to arrest Mr. Harris, and there's no reason that this search should not be viewed through Mr. Harris. And counsel really doesn't address any of those points. And finally, obviously I'll rest on the briefs as far as the sentencing goes, but I think there is a definite unwarranted disparity between the sentences of the individuals, 13 years versus not a single day in jail, I think is too great. And if the court does not reverse on constitutional grounds, it should at least vacate the sentence and remand. Ultimately, the district court rightly acknowledged that this was a close case, and with due respect to the district court, and under this court's overview, the court should reverse and restore the Fourth Amendment, if there are no further questions. Thank you, Mr. Kelleher. I appreciate the court's time. Mr. Kelleher, you handled this case by appointment. Yes, Your Honor. And you have the additional thanks of the court for assuming that. Indeed. Well done. Thank you. All right, the case is under advisement now.